Number 06-1125 Hunt Building Company v. Navy Mr. Schwartz, when you're ready. You've reserved three minutes for rebuttal, I think. Yes, Your Honor. Very well. May it please the Court, Jonathan Schwartz, I represent Hunt Building Company Limited. The issue on this appeal that we challenge is the finding by the board, Armed Services Board of Contract Appeals of the site location as being definitized by the general development map and as confirmed by the Navy at the pre-proposal conference on February 6, 2001. That one issue is the centerpiece of our appeal. There are other issues that relate to this. There are findings by the board that we challenge, one being that the allocation of additional acreage for the fitting of the final design was not a compensable change. We challenge that. Also, we challenge that the appellant, when it sought clarification vis-a-vis the site 4 map and the general development map conflict, simply asked the wrong question. The third or fourth part or finding by the board that we challenge is that the Leopold decision cited in support of Hunt's case before the board is distinguishable from the facts of this particular case. Now, I would like to first address what we perceive to be the most important issue or finding by the board that is erroneous, and that is that the exact location of site 3 was shown in the RFP or the technical provisions and that that was confirmed by the Navy. In the first place, there is no exact location shown in the contract or the RFP. The summary of work, which is found at JA 70, says that the location is approximate. The location shown on the general development map is an approximate location. That is echoed by the site preparation provision in the technical provisions. It says, see the general development map. But again, prefaced before that, they say that is an approximate location. Therefore, there is no way that the board could find in our judgment that the exact location of these sites were designated in the contract. Now, the Navy contended and the board found that the general development map, which is a cross-hatched map shown in the appendix, labeled project location was the designation. But that renders meaningless the technical provision, which follows saying the exact location will be shown by the contracting officer. Now, how does the board or how did the Navy contend that that was done? At the pre-proposal conference, the government testified, or at least declared, that they drew a diagram on a board and said that that was the location for Site 3 that they wanted the parties to follow. But that was not confirmed by minutes. There were no minutes produced. There was no amendment followed up by the Navy. And an amendment was issued referencing other instructions that were given at the pre-proposal conference. But the board seems to have credited that evidence. As I read the board's opinion, it seems to have credited that evidence. So unless we simply say that the board could not lawfully have credited that evidence, that would seem to me to be at least some indication by the contracting officer as to what the precise location of the project was. Yes, Your Honor. And we challenged that because there were no written confirmations. But given that issue, let's say that that happened. It did not comply with the requirements of the contract to being the notice to proposers or the contracting officer's authority of the Federal Acquisition Circulars saying that all directives must be in writing. Did you challenge that point below? Yes, sir. And that's in the record? Yes, sir. It is. We did, and on the briefs. There was a finding by the board, though, that the appellant site plan did not conform to the general development plan. It was not clear evidence of appellant's interpretation of the RFP requirements for the site boundaries. That was a finding by the board. That's correct. If, in fact, the site plan did not conform to the general development plan, which controls? Is it the general development plan that controls? No, Your Honor. Neither controls. And that's why the contractor came forth and sought clarification and asked very specific questions bringing to the Navy's attention the conflict between the two drones. And the Navy's response was such that Hunt interpreted that information in response to support its conclusion that the site for drones. Is this question one we're talking about? In an effort to maximize the neighborhood feel, is that the question you're talking about? On page six of the board's opinion, if you have it there, page 20 of your appendix toward the top of the page, there's question number one. I think that's what you're talking about, right? On page 20? Well, it's page 20 of the appendix, but page six of the board's opinion. Yes. That's the question you're referring to, right? This was the request for clarification? I'm sorry. I've lost the place. In the board's opinion? Yes. Are you looking in the appendix, the white document? Yes. Look on page 20, down at the very bottom. Yes. Are you looking at the appendix? Up at the top, there's a quotation? Yes. Amendment number six? Oh, I beg your pardon. I've got it. Yes. In an effort to maximize the neighborhood feel. When you mentioned earlier the request for clarification that your client made, is that what you're referring to? Was this question the reference? No, Your Honor. You're referring perhaps to the question on page five, the previous page, which is answered by the north of Holloway Drive answer. Is that the one you're talking about? Yes, that probably is. Let me direct the court's attention to page 414 of the appendix. That's the one I'm talking about. This is a request for clarification, pre-proposal, which very specifically says, addresses a site for drawing. It says that indicates that the project limits extend south of Holloway Drive. Yet the cross-hatching shown on the general development map indicates Holloway Drive as the southerly limit of the site. Please clarify the project limits. That's the question as to which the government came back, as I understand it, and replied, North of Holloway Drive. Neither John Paul Jones Drive nor 25th Street is required to remain as long as the design maintains adequate circulation around new housing. Yes. So that answers the specific question about the variance between the cross-hatched section of the general development map and the site for RV map, correct? Yes. With respect to that area. Yes, it did. Right. It certainly did. And indicated that only the cross-hatched area was part of the project. Oh, absolutely. Well, I wouldn't want to infer that that was what the government was saying about that, because it seemed to me, as I read this, it seemed to me evident that they were saying, oh no, that larger area that is on the site for RV map is not included. We mean it to be limited, the area to be limited only to the cross-hatched area, which would give you at least a basis for inferring that the same thing was true of the smaller section that is over by Building 303. No, Your Honor. Here's why. And I understood that Amy and the board would be arguing that. But if you look on page 413, you see there's another question by the proposer. Which one? Question E. It says, the cross-hatching on this drawing only indicates three sites. Please clarify. Answer. Two sites were dropped from the project. The cross-hatching shows the areas that remain. Now, if I were the neighbor and if I were the board, I would have argued or held that that shows the exact location and it shows it in writing. But the flaw in that would be is that that still is not an exact location. Why? Because there are two other, at least, sites shown on that particular drawing that are cross-hatched, and we're referring to Site 4 or Site 3. Where do you have to go to get the answer to that question? You go to Question I on page 414, and that is site-specific. That talks about Site 4, which is really Site 3 because a couple of sites were deleted from the contract. So if I may, Your Honor, I have a board. Well, we have the maps. I think rather than spending time setting up the board and so forth, we have the maps. In fact, I think we all have them in front of us. Yes, sir. You can go ahead. Well, if you would look at the general development map, you'll see that the project limits shown on the Site 4 map went down below Holloway Drive. Sure. Okay. So when I asked the question and the answer came back, it's the area north of Holloway Drive. They prepared their proposal accordingly and did not go below Holloway Drive. So therefore, they complied with the answer to the question. It was a reasonable interpretation, and it was in direct response to their specific question, please clarify project limits. Okay. Enter your rebuttal time. Would you like to stay for the meeting? Yes, please. Very well. Thank you. Let's see. We have Mr. Abraham. Thank you, Your Honor. May it please the Court. The Board's decision should be affirmed for two reasons. First, the plain terms of the contract referred only to the general development map, not the survey map used by Hunt for the boundaries of the construction project. Second, even if Hunt's reliance on the survey map was reasonable, the different maps created a patent ambiguity for which Hunt failed to discharge his duty of inquiry. I'd like to just move to some of the points that Appellant has raised today. Before you go to the specific points, maybe this would come up in one of the specific points, but it is certainly true, as the Appellant points out, that the language under the location paragraph of the contract is approximately, which doesn't give us, starting off, a specific, explicit definition of the project area. I think we all agree with that. Approximately is anything but exact, by definition. That's correct, Your Honor, that Appellant has keyed in on the fact that it says approximately and not exact. All right, and what is it that tells us that the general development map tells us exactly what the project limits are within the limits of its precision, its capacity for precision? Well, Your Honor, I wouldn't say that the general development map finishes the issue, but the Board went on to find that the exact location was clarified at the appendix in 30. But if we look at the sentence, it does use the adjective approximately or the adverb approximately, but then it refers only to the general development map. It does not refer to the survey map. So we have to start with what the plan... Where is the development map referenced? I had it, and then I've forgotten. Do you remember what paragraph that is? I'm sorry, Your Honor? Where the general development map is referenced in the contract. Yes, this is at 71 of the joint appendix is where it's referenced, and the language says... C, general development map. Exactly, it says C, general development map. It doesn't say anything about... And B. Oh, I see. Okay, thanks. It doesn't say anything about the survey maps. The Appellant is saying that because this doesn't say exact location, that that somehow resolves this appeal. That's not true. The issue is whether Hunt's interpretation was reasonable, and it was not. Which aspect of Hunt's interpretation is costing it the problem? Was it the driveway to the officer's quarters? What is it that they had to... Why is it that you contend that they quote, got off the reservation? They proposed to build outside the boundary line, right? Exactly right. Where specifically did they violate the boundary line? Okay, Your Honor, if you'll look with me at the general development map, which is 76 of the joint appendix. When I was trying to get at it, where's the rub? In 76, I've got that. And Your Honor's question, what was that issue? It was the northern boundary, the access road to the B.O.Q. 3. So if you look, Your Honor, at the general development map, which is 76, you look at the northeastern boundary there, you see that the general development map clearly shows the boundary is that access road. Whereas the survey map, which was meant for surveying topographical information, includes more area than that. So the issue here is that northern boundary. And that's one of the places the maps differ. If you also look... So you're saying that the existing service road should be kept. It should have been kept under the general service map. Exactly, Your Honor. And also that that was the northern boundary. Then there was an amendment, right? As a result of question number one. Question number one, they came in and said, and this is again on page 6 of the opinion, 20 in the record. And they wanted to know, in order to have some flexibility, can I encroach on adjacent or vacant unused properties at the east site? So long as it doesn't interfere with expansion of the RV site, the recreation area, or the bachelor offices quarters. Right? That's correct. And the answer is yes, so long as the base has access to building 303. Right? That's correct. If you look down in finding 15, right below that, in line 1, 2, 3, 4, 5, there's the sentence, the design allowed for access to the BOQ area. That's correct, Your Honor. But nothing in this response was inconsistent with the contract, which said look at the general development map. In other words, the Navy was proceeding with the reasonable belief that... No, but the general development map got amended by the answer to question one. Right? Yes, Your Honor, but we would submit that... Because clearly, if they wanted to, they could now, they could splurge over into the... They could actually go south of Holloway Drive, if they wanted to, into the RV area, provided that they didn't interfere with it. And they could go north of the east area. When it says encroach on adjacent or vacant or unused property, you could encroach in any direction, right? That's correct, but, Your Honor, it would have to be on vacant or unused property. I understand. And the Navy did not interpret that, and in our briefs we explain that that did not change the boundaries or the access road, that the access road was the boundary on the north. In other words... And the only data point that establishes irrefutably that the boundary point on the north was the access road to the BOQ was the general development plan. That's correct. But this answer did not change the development map. And as we explain in our brief... What does it mean when the board made the fact-finding that the design, P-2, allowed for access to the BOQ area? Presumably they designed a new route to service Building 303, right? That's correct. Which, why is that inconsistent with what they were told they could do? That is to say, as long as the base has access to Building 303, they said, sure, we'll build a different road. And presumably this space that is off the access road looks like a little parking lot. You have the access road that makes several turns and then turns into what looks like a little parking lot along the edge of 303, correct? That's correct. So that's the access as it existed at the time, and they just changed the access. Now why is that a violation of what they were told they could do, where what they were told they could do is to say as long as the base has access to Building 303? Because the Navy never changed what the boundaries of the project, the construction project, were. In saying that they could encroach on Bacon or Under's land, they weren't changing the boundaries that existed in that general development map. And they did not view, they did not suspect that Hunt was relying on a survey map. And if you look, just to clarify, the back of 303, that's actually a loading dock, and then that's an access road to that loading dock. On the other side is a parking lot. I'm a little confused now as to what this question and response actually tell us. I thought that the question was saying, can we go into that area, which is on the other side of Holloway Drive from the crosshatched area? Isn't that part of the question? This is dealing with a large area that is not crosshatched, but is within the project limits as defined by the RV site 4. Correct? I agree, Your Honor. And when the government comes back and says, yes, as long as you don't, what is it, yes, as long as the base has access and Holloway Drive does not dead end, they're saying you can go into that unused area that's outside the crosshatched area, right? Yes. I don't agree, Your Honor. How can you disagree? Read the answer to the question. They're asking if they can encroach on adjacent vacant unused property at the east site. If you look at the east site, you'll see that you could go down to the left, you could come to the west, you could go to the east, and you could go to the north, and go to the southwest. But I do understand, Your Honor. I think it is saying what you're saying is that it's allowing further encroachment provided you can show some other means of access. Well, now, the contractor all consistently said that it thought that access was being provided. If you start south, was it Holloway? No, it's John Paul Jones Drive. If you start south on John Paul Jones Drive, you find an alleyway or road into and a parking lot nearby Building 303, correct? That's correct. You're looking at the general development?  What I neglected to point out, Your Honor, is that... Why isn't that access to Building 303? Which portion are you talking about, Your Honor? From the north side? Yeah, coming down from the north side. You come south on John Paul Jones, one block, and you turn left, and you go into... There's a street there, and you go in, and you find yourself in a parking lot that's next to 304, probably serves 304 and 303, especially since you told us that the south end of 303 is just a docking station, not a parking lot. Right. This is not... The front is not the access that the Navy meant. How did the contractor know that? Well, let me back up, Your Honor. How did the contractor know when they said, it's okay, you can do this encroaching so long as they have access to the Building 303? If you permit me, Your Honor, if you have the supplemental joint appendix with you, if you look at 429... There are so many supplemental joint appendixes. And this is what the appellant filed. This is what the appellant filed. Thank you. If you look at Joint Appendix 429, which is now part of the record, you'll see that this is an overlay map which shows the site survey maps, limits overlaid over the original general development map. And what I wanted to take, Your Honor, to the point was this survey map's limits not only add extra area above the north on the access road, the BOP 303, but also if you look to the east, they infringe on a building called Building A. If you look at the southeast border. And they also infringe, as we discussed, to the south of Holloway Drive. And they also cover the area which is the swimming pool, which is that square cut away from the south. And this is what I should have brought, Your Honor, to initially, the fact that this is an unreasonable interpretation because, first of all, not only is it infringing on the access road, it's also infringing on the base commander's quarters. That's what Building A is in the southeast. And that it's infringing on the south of Holloway Drive and the swimming pool, which were specifically said to remain. Now, as a bidder, all the answers that the Navy gave were consistent with what they understood the boundaries to be, the general development map. When asked, and this is the question that Hunt asked, when they asked if they could go south of Holloway Drive, the answer clearly came back, no, you cannot. And if I can refer to... Well, you couldn't go south of Holloway Drive unless accepted an answer to question six. One. Pardon me, question one, pardon me. Correct, which was a later question. But the point is that the... Well, at which point is the Navy deciding what the final boundaries are? Isn't it kind of a moving target? I don't think so, Your Honor, because the general development map was still controlling at this time. When asked by the contractor, you know, what are the limits? Why didn't the Navy say general development map, period, no exceptions? Well, Your Honor, they didn't have to do that because the question was just about the southern boundary. The question said, is the southern boundary of Holloway Drive or not? I'm paraphrasing, obviously. And they said it is the... But they changed their mind. In answer to question one, the Navy changed its mind. Well, I can't... The question can't have been regarded by the Navy as solely with regard to the southern boundary under Holloway Drive because why then would they have said something about building 303, which is way on the other side? Well, the... Now I think, Your Honor, we're mixing questions. The question where they were asked about the southern boundary, which maybe to make this simpler, we'll look at... I mean, I understand everything up to that question that was asked, question number one. I understand your position, which is they consistently took the position that the GDM gave the contractor information, all the information the contractor needed to know about the scope of the project. And the RV site for whatever it is, map, was not a definition of the project limits. But once question number one is asked, now it seems to me if your position is, well, that GDM still controls, I think you have a hard time maintaining that position because it seems to me, and you tell me if I'm wrong in reading it this way, that that question explicitly waives with respect to some amount of territory the GDM as being the only place that this project could work. And the terms of the waiver seem to be that as long as you don't interfere with something in the vacant area south of Holloway Drive and as long as you maintain access to 303. And my question to you is, given that that looks like a waiver, A, is it, and B, what is it that the government can come back and say, well, no, the waiver didn't extend as far as the contractor thought? To question one, Your Honor, no, it's not a waiver. And second, the response is what was in our brief, which is that this question is about merely the subject of access to the BOQ, not to the boundaries of the project. How can you say no waiver? I mean, your position on the GDM is that the hatch marks tell the story. Anything outside the hatch marks is verboten, right? And then in answer to question one, the Navy said you can go outside the hatch marks if you want, provide it. Well, Your Honor... How can the answer to question one be consistent with the position that anything outside the hatch marks is forbidden? Because, Your Honor, the board's, excuse me, the answer to the question isn't about the boundaries. It's about proposing something beyond the areas that it discusses. And the board considered this question. I don't want to let that escape the court. The board considered both these questions and considered and found that the plain language of the contract as amended still referred to the general development map as the project's boundaries. One of the questions was whether the error did so do. Well, I don't think so, Your Honor. I think also that if you look at our brief, we explain that this is... access to the BOQ is not the same as what the boundaries of the project are. Isn't your position that access to the BOQ is pursuant to the utility road that went to the loading dock and that you had maintained during the course of negotiations or at some stage that you had to keep that road open during construction? That's correct. And that if you wanted to move the road, ultimately you could, but we needed that road to go into the south end of 303. That's correct, Your Honor. And that's also in the record, that it had to be open during construction, so that it should have brought to the court's attention. Let me ask the question this part... I'm still trying to go back to the Exhibit C on 429 and the additional appendix that was submitted. What is that dashed line that goes around from John Paul Jones Drive all the way around to the end? See, that takes in that portion that goes up to the loading dock of 303 and the access road. Is that dashed line the boundaries of the project that they're talking about, or is it just the cross line? That is the line that's equivalent to the line that was drawn in the survey. That's the overlay. That's the overlay, so that's the survey maps. So that's outside of the project boundaries. That's correct. Now, going back to the other exhibit that was submitted as a visual aid, JA-86, that was submitted for a visual aid today, where is the interference with the existing road service and the service road to 303? This is the HUT exhibit, JA-86, the one that was submitted for today's argument. That's not on the additional exhibit, but there was one that was submitted for a visual aid, JA-86. And your question, Your Honor? The line there is the project is really within the existing service road and the service to the BOQ, isn't it? So why would that be extending beyond the boundary line? Because this is a proposal that was submitted by HUT. Right, Your Honor. I think it's difficult to see, having just seen this for the first time, I think it's difficult to see here that the proposed drawings that they submitted went beyond the boundaries. And that was one of the issues we talked about in the brief. If I'm getting this right, this is one of those submissions that actually went beyond the boundaries, but it's tough to see that without the overlay. Let me ask, I think I understand your take on question number one and the response, but let me test my understanding of it with this question. Given the response that the government gave to the question with respect to land that's outside the cross-hatched area of the GDM, and that is what the question appears to have been directed to, would it have been permissible for the contractor to have used a portion of that area, I guess it's, let's call it the area around buildings 303, 304 and the tennis court, that's over toward the tennis court, that's within the dashed line called the project limits, but outside the cross-hatched area, but did not interfere with the road and the parking lot next to building 303? Do you follow my question? Almost, Your Honor. Where are the tennis courts? All right, the tennis court is 392. You see that over, if you have this map, this is exhibit C, this is the GDM with the overlay, but if you've got the GDM, it'll probably have that on it anyway. Okay, you have that? Yes, I do. All right, and you see the tennis court over there, 392? Yes. Okay, there's a kind of chunk of land that is to the right of the access road to the parking lot for building 303, you see that? Now suppose if the contractor had wanted to go in there and use some of that for some purposes, is the Navy in effect giving the contractor permission to do that as long as it doesn't disrupt that road? I think so, Your Honor, because that would be, in my opinion, vacant and unused property. Right, so what you're saying, as I understand it, is that when you say as long as the base has access to building 303, you mean as long as the existing access is not interrupted or destroyed. Exactly. Is that from John Paul Jones Drive then? That's correct. In other words, could they have moved that existing road up to the boundary line of the survey map and brought it over? I mean, that still could be an answer to a question that the Navy was trying to answer, isn't it? Provided as long as you have access to 303 from John Paul Jones Drive. But we would submit, Your Honor, that they could not move the access road because we were telling them they still had to maintain access to the BOP, but we never said, hey, you can move the access road. They were asking permission to encroach on adjacent unused property. The road, the piece of the road that came off of John Paul Jones that went east and then north, the access road was not unused. Exactly. Isn't that your linkage? Exactly. And so when you say yes, so long as the base has access to the building, well, you can't encroach on the road. Right, and that's borne out by the record. That's your case in a nutshell, I think, isn't it? Yes, Your Honor, and that's borne out by the record because the board considers that and considers this question, but also the fact that when the mistake was discovered, in other words, the two interpretations were discovered, the reason it was discovered is because they were planning on moving that access road and that was going to create problems with the drainage, et cetera, and all kinds of problems that the Navy had hoped to prevent had been cleared. Okay. Well, I think we understand, and thank you for your assistance. For those reasons, of course. Very well. Now, Mr. Schwartz, we gave Mr. Abraham a good deal of extra time. We will restore your full rebuttal time if you need it. Thank you, Your Honor. No, I want to make sure that we're clear on the progression of these drawings. The general development map, obviously, and the site format were RFP drawings. Those were issued with the RFP. Hunt's supplemental, or the overlay, was simply to show the contrast. We're with you. Hunt's proposal drawing on which the award was made is this P2, shown at JA456, and this final drawing that was submitted as a visual at JA86 is the final, final design as approved by the Navy. Now, if you compare that to the general development map, look what's happened to Hunt's original design. Taking the Navy's cross-hatched argument, look where we are now. We're way over to Sylvester Drive. If you overlay JA86 with the earlier documents, you'll see that you were able to encroach to the east and to the north. Correct. But that you preserved the existing service road at the request of the Navy. That's correct. And the only other point to be made there is that the preservation of that service road was an after-award fact, not pre-award. It was something that happened way after when the design was being finalized. They said, oh, by the way. But the issue in the case of whether or not your plan, I believe, was put on notice early on by the RFP documents drawing as to whether that existing service road would have to stay. Yeah, that's correct. And your client went down the road in designing and whatnot, either thinking that it didn't have to stay where it was. It could be moved or something could happen to it, right? Only access was required to that area. And that access there? The argument that is purely bogus in this case is that that is the northern boundary line of the project. But it's not purely bogus. There's support for the argument on the GDF drawing, right? Oh, no. Well, no, not even there. If you look carefully at the general development map, the big one, not my visual aid in them, you'll see that the crosshatch even cuts into the access road. Wow. Well, it's slight. Yeah, I think now we're talking about at most a couple inches. Correct. You know, another point before I rest, Your Honor, is that if you took away this John Paul Jones, as was said we could do, what becomes of that access road? It's useless. It's a truncated road to nowhere. Oh, no, you weren't told that you could dispose of good old John Paul Jones and just throw it away. You were told you could get rid of John Paul Jones provided you retained access or what was the word? Access to the building through. Correct. Or building to the access. And if the access road goes to a service dock on the south end of 303, you know, that's where they take the trash out and stuff. That's correct. So if your theory was that you could get rid of the access road entirely. Correct. Then how's the trash get out? That's a good question. That's a Navy problem. But you know what the answer to it is? The Navy never specified what kind of access they needed to the back of the building 303, to the front of the building 303. All you had to do was propose an access to that building. It was never any form of access required in the RFP or any other. Other than what might have been specified in the GDM. Yes, that's right. But the GDM was explained by the answers to Hunt's questions. As you could develop further north of Holloway and to the east on unused property. Very well. Mr. Schwartz, one quick question. The visual aid that you submitted at JA-86. Yes. That's the final plan that was approved by the Navy? Yes. So you maintained the existing road and the service road to BOQ, 303. And you did get additional sites on the eastern side, on the other side. Is that correct? I believe that's correct. Very well, thank you.